### FOX v. GUNN et al.

(Circuit Court of Appeals, Ninth Circuit. October 17, 1904.)

#### No. 1,043.

1. TRUST—SUIT TO ENFORCE—EVIDENCE CONSIDERED.

Evidence considered, and *held* to establish complainant's right to an undivided interest in certain mining property and claims held in trust by one of the defendants under an agreement that on the repayment to him of advances made thereon, either from the proceeds of sales or ore, the property should be divided, and to entitle complainant to an accounting from defendant, as against such advances, for the value of certain of the claims which he had disposed of, denying complainant's interest therein.

Appeal from the Circuit Court of the United States for the District of Oregon.

Mitchell & Tanner and M. B. Kellogg (A. E. Shaw, of counsel), for appellant.

A. C. Hough, M. S. Wilson, and C. H. Lovell, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The appellant was the complainant in the court below in this suit in equity, to which the appellees were made defendants. In his amended bill the complainant alleges that

he is, and for a long time prior to the filing of the original bill was, the owner of an undivided half of certain described real property, mines, and mining claims, and of the ores and precious metals contained therein, situated in the county of Josephine, state of Oregon, to wit: (a) The southwest quarter of section 36, township 40 south, range 8 west, Willamette meridian, embracing what is called in the record the "Waldo Mine"; (b) the south half of section 25, township 40 south, range 8 west, Willamette meridian, also embracing a mine with ores and precious metals; (c) a certain lode-mining claim adjoining the Waldo mine, located under the laws of the United States by the complainant, Fox, on the 12th day of March, 1900, called the "Young Tom Lode"; (d) a certain other mining claim adjoining that last described, located under the laws of the United States by one Oliver Roberts on the 12th day of March, 1900, and called the "Young Lou Lode"; and (e) a certain other mining claim, adjoining that last described, located under the laws of the United States by one Charles Decker on or about March 12, 1900, and called the "Young Charley Lode."

It is alleged, among other things, in the amended bill, that the property mentioned is of the value of $200,000, and—

"That the said defendants, and each of them, though at times heretofore having admitted and acknowledged the ownership of the plaintiff, your orator, to the undivided half of all the above said properties and mines and mining claims, now deny the same, and claim an interest and interests in said undivided half adverse to the claims and ownership of your orator, but that the nature and the amount of said claims of defendants, and each of them, your orator is unable to state; and your orator states that the reason of such inability on his part is that such claims are made by defendants from time to time in varying terms, and that they at times deny that your orator has any title or interest in any of said properties, mines, and mining claims, and at other times assert that your orator has title and interest in said properties, mines, and mining claims only in a small fraction, and much less than an undivided half, and that they own all said undivided half so belonging to your orator, except a very small proportion thereof; that the claims of said defendants, and each of them, against said undivided half, are, and each of them is, without any right whatsoever, and that neither of the defendants have any estate, right, title, or interest whatsoever in and to said undivided half of said real properties, mines, and mining claims above described, or any part or portion of said undivided half."

The prayer of the bill is, among other things, that the defendants be required to state the nature of their claims, and for a decree that neither of them have any estate or interest in the undivided half of the property owned by the complainant, and that each of them be enjoined from asserting any claim thereto adverse to the complainant, and that the defendants be required to execute to the complainant such grants and other conveyances as may be proper, and for general equitable relief.

The defendants answered the amended bill, and at the same time filed, by leave of the court below, a cross-bill. In their answer they denied, among other things, that the complainant is or ever was the owner of any interest in any of the property mentioned in the bill, except as stated in the answer and in the cross-bill. In respect to the three mining claims mentioned in the amended bill as the "Young Tom Lode," the "Young Lou Lode," and the "Young Charley Lode," the answer of

the defendants denied that any vein or lode was discovered in either of those claims prior to the location thereof, and that subsequent to their location the locator of each of the claims failed and neglected to sink any shaft, or to make any cut or crosscut or tunnel, or to do or perform any of the work upon the claims required by section 3 of an act of the Legislature of the state of Oregon approved October 14, 1898, entitled "An act relating to mining claims, repealing chapter xiii of the Code of Civil and Criminal Procedure in Justices' Courts, and sections 3827, 3828, 3830, 3831, 3832, 3833, 3834, 3835, and 3836 of chapter LX of Hill's Annotated Laws of Oregon" (Laws 1898, p. 17), by reason of which the answer averred that each of those locators forfeited and lost all right thereto, and that the defendant Gunn, finding the ground theretofore covered by the Young Tom location vacant and unoccupied, located the same on or about the 14th day of June, 1900, under the mining laws of the United States, as the Spruce claim, marking the boundaries thereof, and recording the claim as required by law, and doing the necessary work thereon, which disclosed a vein or lode of rock in place, carrying copper and gold, which claim the defendant Gunn has at all times since claimed and owned, to the exclusion of the complainant, Fox, and with his knowledge and consent; that on or about the same day in June, 1900, the defendant Draper located, under the laws of the United States, as the Pine claim, the ground theretofore covered by the Young Lou Lode, marking and recording the claim as required by law, and doing the necessary work thereon within the time required by law, and finding in the bottom of the shaft a vein of rock in place, carrying copper and gold, which claim the defendant Draper has at all times since claimed and owned; that on or about the 14th day of June, 1900, the complainant, Fox, "by and through his servants and agents," located as the Fir claim the ground theretofore covered by the Young Charley Lode, marking and recording the same as required by law, and doing the necessary work thereon within the time required by law, and disclosing in the bottom of the shaft a vein or lode of rock in place, bearing copper and gold; and that thereafter, to wit, July 5, 1900, Fox executed to the defendant Gunn a deed conveying all his interest in and to the Fir claim to Gunn, which deed was duly recorded in the office of the recorder of the county in which the property is situated.

The cross-bill alleges, in substance, that about the month of July, 1896, Fox, being desirous of obtaining bonds for deeds or options of purchase upon mines and mining claims in Josephine county, Or., and not being financially able to carry out his desires in that regard, applied to Gunn for financial assistance, whereupon an agreement was made between the two by which Fox should proceed to the county named, and obtain bonds and options upon mines and mining claims in that vicinity—Gunn to advance the necessary money to obtain such bonds and options, and with which to prosecute development work upon such mines and mining claims, and also money with which to pay the expenses of locating such mining claims as Fox might discover and be able to locate—all of which bonds and options and locations should be taken and located in the name of Gunn, or in the name of such person as he might designate; that it was understood that all money so ad-

vanced by Gunn and so expended should be repaid to Gunn out of any sale or sales made of the property, or out of any ores extracted therefrom, the remainder of which should be owned by Fox and Gunn in equal proportions; that Gunn "should hold and own said properties, and maintain and operate them as he might see fit until he was repaid in full for all moneys paid, laid out, expended, or advanced on account of said properties, and, upon being so repaid, that he would execute all proper deeds and conveyances for an undivided half thereof to the said defendant Fox"; that, under and by virtue of this agreement, Fox proceeded to Josephine county, Or., and there obtained bonds and options on certain mines and mining claims, known as the "Free and Easy," "Sowell No. 1," "Sowell No. 2," "Jumbo Elephant," "Baby Elephant," and other mines and mining claims unknown to the cross-complainant, and did make locations of certain other mines and mining claims in the same vicinity, to wit, the Scott, Dodd, Gunn, Folsom, and others, to the cross-complainant unknown, all of which were subsequently conveyed by deeds to Gunn, and that subsequently, and while the contract between those parties was in full force, the aforesaid southwest quarter of section 36, embracing the Waldo mine, was conveyed to Gunn by its then owner, John C. Elder, Gunn paying to Elder therefor the consideration for the conveyance, namely, the sum of $5,500, the title to which Gunn still holds subject to the rights of Fox and Draper; that thereafter, and on or about February 12, 1900, Gunn purchased, through his attorney and trustee, Hough, from the Oregon & California Railroad Company and the Union Trust Company of New York, the aforesaid south half of section 25, paying therefor the sum of $760, which property was duly conveyed to him by deed, and the title to which Gunn still holds subject to the rights of Fox. The cross-bill also alleges that all of the bonds and options so secured upon mining claims were allowed to expire, and the title thereto returned to the owners thereof, and that all of the mining claims so located as aforesaid were abandoned and forfeited by reason of the wrongful location thereof by Fox, and by reason of his failure to perform or cause to be performed, for and on behalf of Gunn or otherwise, the annual labor thereon required by law.

It is further alleged in the cross-bill that, after acquiring the aforesaid southwest quarter of section 36 and the south half of section 25, Gunn expended large sums of money in developing the Waldo mine, contained in the southwest quarter of section 36, and in prospecting and attempting to discover a lode or vein of mineral within the boundaries of the south half of section 25, and in work upon the aforesaid mining claims prior to their abandonment and the expiration of the options mentioned, aggregating the sum of $27,955.76, and has received as proceeds from the sale of ore extracted from the Waldo mine the sum of $1,686.07, and no more; that on or about the month of December, 1897, Gunn and Fox entered into a contract, by the terms of which Fox agreed to introduce to Gunn one McCormick, who had discovered a method of making blasting powder, and who was without means of prosecuting his experiments and obtaining letters patent therefor, and who wished the financial aid of Gunn; that in pursuance of that agreement the three met, and agreed that Gunn should furnish certain money to

enable McCormick to prosecute his experiments and to obtain letters patent for his invention in the United States and foreign countries, and that when the powder was perfected, and letters patent had been issued, and the powder placed upon the market, all moneys so advanced by Gunn should be returned to him, and an undivided half interest in the invention and letters patent should be conveyed to Gunn, and the remaining half become the property of McCormick and Fox; that, in the event of a failure of the enterprise, all moneys so advanced by Gunn should be repaid to him by Fox; that, in pursuance of that agreement, Gunn advanced the sum of $2,911.30; that it subsequently turned out that no patent could be obtained, and the experiments were not successful, so the whole project proved a failure, leaving Fox, according to the averments of the cross-bill, indebted to Gunn therefor in the further sum of $2,911.30, none of which has been paid; that the aggregate amount of the moneys advanced by Gunn under the aforesaid agreements with Fox is $29,180.99.

The cross-bill further alleges that it was expressly understood and agreed between Gunn and Fox that, when Gunn should be fully repaid all moneys advanced by him "for or on account of any and every agreement or mining enterprise entered into" between them, then Gunn would execute to Fox or his assigns a proper deed or deeds to an undivided half interest "in and to any and all real properties and mines and mining claims obtained or owned" under the agreements, which the cross-bill alleges Gunn's willingness to fulfill. It is further alleged in the cross-bill that the Waldo mine, by reason of the development work made thereon with money advanced by Gunn, has a prospective value of about $50,000, and that about the month of April, 1900, Fox sold of his contingent interest in the southwest quarter of section 36, in which that mine is situate, an undivided one-fifth to the cross-complainant Draper for the sum of $1,000, one-half of which sum was thereupon paid to him by Draper, and that thereafter, and before the month of November, 1900, Draper paid to Fox on account of that purchase the further sum of $200, leaving due a balance of $300, which last-mentioned sum Draper tendered to Fox on the 23d day of September, 1901, together with a proper deed for his signature and acknowledgment, for the conveyance of such one-fifth of Fox's alleged contingent undivided half interest in the aforesaid southwest quarter of section 36, but that Fox refused to accept the $300 or to execute such deed. The cross-bill also contains a tender by Draper and the averment of a willingness to pay to Fox the $300 on his executing the deed.

The prayer of the cross-bill is, among other things, for a decree to the effect that Gunn is the owner of the southwest quarter of section 36 and the south half of section 25 in township 40 south, range 8 west, Willamette meridian, and that he holds the title to an undivided four-tenths of the southwest quarter of section 36, and the title to an undivided half of the south half of section 25, in trust for Fox, subject to a lien upon the interest so held in trust, for the sum of $27,875.52; that Fox be required to release and relinquish to Draper an undivided one-tenth of the southwest quarter of section 36, and execute to Draper a deed therefor; that Gunn holds a title to an undivided one-tenth of the southwest quarter of section 36 in trust for Draper, subject to a lien

for the sum of $1,305.27 due Gunn by Draper; that Fox be adjudged to pay Gunn $27,805.52 within a time to be fixed by the court, upon the payment of which Gunn should execute to Fox a deed for the undivided four-tenths of the aforesaid southwest quarter of section 36 and the undivided half of the aforesaid south half of section 25; and that upon the failure of Fox to make such payment the said four-tenths of the southwest quarter of section 36 and the undivided half of the south half of section 25 so held in trust by Gunn for Fox be sold to satisfy the demand of Gunn.

A replication was duly filed by Fox to the answer of the defendants, and an answer to the cross-bill.

From the foregoing statement of the pleadings, it will be seen that Gunn and Draper denied any interest in Fox in either of the mining claims mentioned in the bill of complaint, but admitted a contingent interest in him in the southwest quarter of section 36 and the south half of section 25. It is perfectly plain, however, from the evidence in the cause, that Fox's interest was precisely the same in the three mining claims described in the amended bill of complaint as the "Young Tom Lode," the "Young Lou Lode," and the "Young Charley Lode," and also in the record as the "Fir," "Pine," and "Spruce," as it was in the southwest quarter of section 36 and the south half of section 25. This fact very clearly appears from the testimony of both Gunn and Draper themselves. It was admitted upon the trial that in pursuance of the agreement between Gunn and Fox that in June, 1899, a bond for a deed was taken in the name of Gunn from Joseph L. Sowell and R. L. Ank for the quartz mining claims known as the "Baby Elephant," "Jumbo Elephant," "Sowell No. 1," and "Sowell No. 2," and that thereafter the quartz mining claims known as the "Dodd," "Scott," "Folsom," and "Gunn" were located, all of which locations and bonds were afterwards abandoned. But it appears from the testimony of Gunn himself that while they existed he advanced moneys for work upon them, as well as upon the three mining claims described in the amended bill of complaint, which moneys so advanced were expended by Fox upon them. It is true that Gunn, after having testified, in effect, that the Waldo mine and the south half of section 25 and the Sowell and other mining claims mentioned in the record as having been bonded, located, and afterwards abandoned, were all acquired under the general understanding between himself and Fox that the two parties were to own them in equal shares after the advances made by Gunn had been repaid to him, and that he and Fox had never made any change in their general plan, when asked upon cross-examination, "Is it not a fact, Mr. Gunn, that these three mining locations known as the 'Spruce,' 'Fir,' and 'Pine' were also secured as a part of this same general plan?" answered, "I don't know anything at all about it. I don't remember them at all." A little further along this witness was again asked with respect to the Spruce, Fir, and Pine locations, and testified as follows:

"Q. Is it not a fact that those claims were secured in the same general manner, and under the same general purpose, and with the same intent? A. No. Q. They were not? A. They were not. Q. Can you state how they were secured? A. They were secured in furtherance of a new corporation which was intended to be form[ed]. Q. What corporation was that, Mr. Gunn? A.

The corporation that some gentlemen from Colorado, who had means, and who were negotiating for neighboring properties, were forming."

An exhibit being shown the witness, he was asked:

"Q. On this map, Mr. Gunn, I call your attention to the three claims adjoining the Waldo copper mine on the south, marked 'Fir,' 'Pine,' and 'Spruce,' and ask you if you know whether or not they correspond to the three mining claims designated on the complainant's amended bill as the 'Young Lou,' 'Young Tom,' and 'Young Charley'? A. I have learned it since the commencement of this suit. Q. You have learned it since the commencement of this suit? A. Yes, sir. Q. In whose names were those three claims located? A. I think it was Draper, Fox and Gunn. I am not sure. Q. Draper, Fox, and Gunn? A. I think so. Q. You say, Mr. Gunn, that these claims were located in connection with a project to incorporate a company? A. Yes, sir. Q. What was the purpose of that company? A. The purpose of the company was, they had negotiated the purchase of adjoining claims, and were becoming interested in the district for the development of copper claims. Q. Had that company been incorporated? A. No. Q. It had not been incorporated? A. It had not. Q. Had you any interest in that corporation? A. I would have had if I could have fixed something up with Fox. Q. Had the defendant Draper any interest in that company? A. He had. Q. Had the complainant, Fox, any interest in that company? A. No. Q. One of those claims, however, was located in the name of A. W. Fox, wasn't it? A. It was, as a compliment to him. Q. Where did the money come from to pay for those locations? A. I furnished it. Q. You furnished it? A. I think, I don't know, I am sure. I really don't know. Q. You don't know whether you furnished that money or not? A. I really don't know. Q. Do you know who made those locations? A. They were made by— No, I can't say now who made them. Q. Were they made by Mr. A. C. Hough? A. I couldn't tell you. Q. Were they made at your request? A. No; they were not. Q. They were not made at your request? A. No. Q. You don't know where the money came from to pay for them? A. No; I do not. Q. And you don't know who paid it? A. No; I do not. Q. Are those locations still alive? A. I couldn't say. I have never been on the ground. T think they are. Q. You never have been on the ground? A. I never have been on the ground. Q. Do you know whether the assessment work has been done? A. Yes. Q. Do you know whether the assessment work was done on the three claims as previously located? A. I don't know. Q. You don't know? A. No. Q. As a matter of fact, then, you want it to be understood that, so far as these three locations are concerned, you have no knowledge of your own on the subject? A. I have no knowledge; no recollection. Q. Did you ever give the complainant, Fox, any consideration for the deed which he made to you to one of these claims? A. None at all. Q. Did you request him to make that deed to you? A. I asked him if he would sign that deed transferring that claim to me. He said, 'Yes; certainly;' and he did. Q. Did you explain to him at that time that these claims were not included in the general purpose with which you and Fox had operated up there? A. No; I did not. Q. It had been customary, had it not, for the complainant, Fox, to take deeds and bonds in your name? A. Yes, sir. Q. And so far as anything that you told him was concerned, you treated this location in exactly the same way, did you not; asking him to deed it to you? A. I can't say that I did. Q. Did you explain to him, when you asked him to deed it to you, that it was not a part of that? A. No; I did not. Q. Have you any other mining properties in this district, located since the 1st of May, 1900? A. Yes."

Draper, having testified something in reference to the Waldo Smelting & Mining Company, a corporation organized under the laws of the state of Colorado, was asked:

"Q. This last corporation you have referred to— You are interested in that, are you? A. Yes, sir. Q. I presume your codefendant Gunn is also interested in it? A. He is the president of the company. Q. He is the president of the company? A. Yes, sir. Q. Who else is interested in that company? A. I can't give you the list of the stockholders, but Mr. John Barth, of Milwaukee,

is a stockholder; Mr. Charles L. Tutt, of Colorado Springs; Mr. Spencer Penrose, of Colorado Springs; Mr. Richard Penrose, of Philadelphia; Mr. Bond Thomas, of New York; and some miners, whose name I have not got. Q. Did you and Mr. Gunn secure whatever interest you may have in that property by reason of turning over to that company these eight mining claims known as the 'Chestnut,' 'Laurel,' 'Poplar,' 'Oak,' 'Cedar,' 'Fir,' 'Pine,' and 'Spruce'? A. Am I to testify for Mr. Gunn, or just for myself, Mr. Shaw? Q. Testify for both, if it is in your knowledge. A. Only so far as I am concerned, I turned in the claim standing in my name known as the 'Fir,' as a partial interest that I might have in the Waldo Smelting & Mining Company. Q. Of your own knowledge, then, you don't know whether the defendant Gunn turned over any of this property to that corporation, or not? A. Yes, sir; I do know. Q. Well? A. Mr. Gunn turned in his three claims. Q. Which were his three claims? A. The Spruce, Pine, and Oak. Q. From whom were the other claims secured, if you know? A. From the owners thereof—Mr. Tutt, Mr. Penrose, Mr. Barth, and Mr. Thomas. Q. Did these gentlemen that you have just mentioned locate these various claims themselves? A. I located them as their agent. Q. You located them as their agent? A. Yes. Q. These claims were all located in June of 1900, I understand? A. Yes. Q. At the time you were in the employ of the complainant and defendant Gunn. Is that correct? A. Yes, sir. Q. The assessment work upon these claims was done by whom? A. It was done under my direction. Q. Yes; by whom? A. By various contractors and miners. Q. Were those contractors and miners at that time employed upon the Waldo copper mine, and sent over there to do this work? A. They were not employed on the Waldo copper mine. Q. Had they been employed upon the Waldo copper mine? A. I think not. Q. It is your impression, then, is it, that outside miners were secured to do this work under your direction? Is that correct? A. The contracts were advertised, the work was advertised, and bids were received for the work on the consolidated group, as we called it. Q. Did I understand you this morning to state that Mr. Thornily, your foreman, did what is known as the 'state work' on these mines? A. No; I simply requested Thornily, at any time when I was absent, to see to it that the assessment work was properly done. Q. He was at that time employed upon the Waldo copper mine, was he not? A. Yes, sir. Q. I would like to ask, Colonel Draper, if you are interested at the present time in a group of mines known as the 'Monarch Group'? A. Yes, sir."

We think it perfectly clear from the testimony of Gunn and Draper, to say nothing of that of Fox, that the latter had precisely the same interest in the ground covered by the Pine, Fir, and Spruce claims that he had in the balance of the property described in the amended bill. The original locations of that ground were made by Fox under his agreement with Gunn, and the relocations of it were made by Draper while in the employ of Gunn and Fox, under the same general agreement, and with money furnished by Gunn under that agreement, and for the repayment of which, in part, Gunn, in his pleadings and in his testimony, asserts the right to withhold from Fox the conveyance of any interest in any of the property in question. We agree with the court below that, under the contract between Gunn and Fox, all the moneys advanced by Gunn in pursuance of it were to be returned to him before Fox should receive anything—not, however, as is claimed in the cross-bill, out of Fox's half, but out of the whole property—and that such reimbursement should be made either out of proceeds arising from working the mines and mining claims, or from the bona fide sale of the whole or any part of the property, and that the title to the property should remain in Gunn until such reimbursement. But surely, when Gunn disposed of any of the property embraced by the contract, the proceeds thereof, whatever they may have been, should be applied upon his claim against the property covered by the agreement.

We also agree with the court below that Draper is entitled to the one-fifth of Fox's interest in the southwest quarter of section 36 upon the payment to the latter of the balance of its purchase price. It does not appear that any time was fixed by the parties for its payment, nor that the deferred payment should bear interest, and it does not appear that an unreasonable time elapsed prior to the tender of the balance due from Draper to Fox. The record shows that Gunn disposed of a part of the property in which Fox was interested to the Waldo Smelting & Mining Company. It does not show what he received as a consideration for such transfer. But whatever it was, upon no principle of right or justice can Fox be deprived of his interest in it. For aught that the record shows, the consideration so received by Gunn may have been sufficient to repay the amount of money advanced by him under his contract with Fox. It will not do to say, as did the court below in its opinion, that as to these claims "there is nothing from which it appears that they are of any substantial value; nor is there any specific claim for relief made in respect to them." They may have been, as has been said, of very great value, for anything that appears to the contrary. And as to the claim for relief in respect to them, the complainant sought by his bill the precise relief in respect to those claims that he did in respect to the southwest quarter of section 36 and the south half of section 25. The interest of Fox in all of that property was held by Gunn in trust, and the proceeds of the three mining claims are to be accounted for by him as such trustee, just as he accounted for the $1,686.07 realized by him from the sale of ore from the Waldo mine.

Gunn and Draper by their pleadings not only deny any interest of Fox in the ground covered by the Pine, Spruce, and Fir locations, but further deny that he is or ever will be even entitled to a conveyance of any interest in the southwest quarter of section 36, or the south half of section 25, until all of Gunn's advances shall have been repaid out of Fox's interest therein. The court below was therefore also in error in saying, as it did, at the conclusion of its opinion, that neither Gunn nor Draper questioned the right of Fox "to a conveyance of an undivided four-tenths of the properties in question" upon the reimbursement of Gunn out of the whole properties, and that therefore there was "no occasion for any decree respecting such right." Having found—and rightly found—on that issue in favor of Fox, he was entitled to a decree fixing his interest in the property, and adjudging the terms upon which it should be conveyed to him. To so adjudge will necessarily involve an inquiry into the amount of the proceeds received by Gunn by the disposal of the ground covered by the Pine, Spruce, and Fir locations.

It results that the judgment must be, and is, reversed, and the cause remanded to the court below for further proceedings not inconsistent with this opinion, and with leave to the respective parties to amend their pleadings and to take further testimony if they shall be so advised.